Good morning, Your Honors. May it please the Court, my name is Ada Wong on behalf of the appellant Daniel Garcia. I would like to reserve three minutes of my time for rebuttal. As a brief overview, Mr. Garcia worked for Walmart since 1994 until he was compelled to resign in November 2019. That's approximately 25 years he was employed at Walmart. In the last 18 years of his employment, he worked in the lawn and garden department as an associate. Walmart knew of his vision impairment, and the various managers that came and went from his store had accommodated him throughout his employment with different accommodations. This case is on appeal because the district court erred in granting summary judgment in favor of Walmart. The lower court erred by ignoring the summary judgment standard and instead substituted its own findings on hotly disputed facts and rendering conclusions that a jury is supposed to make. As such, my client and I respectfully request, Your Honors, this panel to reverse and remand this case for trial. Mr. Garcia brought claims under the ADA, the Washington Law Against Discrimination, and other laws. For this morning, I intend on focusing on the disability discrimination, failure to accommodate, and retaliation claims. The heart of this appeal falls on the lower court's failure to follow the summary judgment standard. Civil Rule 56A is clear, and I quote, The court shall grant summary judgment if the movement shows that there is no genuine issue as to any material fact and the movement is entitled to judgment as a matter of law. It is not for this panel or for the lower court to weigh conflicting evidence with respect to disputed material facts. And there were disputed material facts in this case. Which were? Which were? Which were whether or not there was adverse action, whether or not there was causation in terms of the disability discrimination claims as well as retaliation claims. Walmart had testified through its own 30B6 corporate representative as well as their key witness, People Lead Alvarez, that they were not aware of any expected return to work date. At summary judgment, Walmart had tried to allege that they actually knew about this expected return to work date and therefore all of its actions were justified. There were also disputed material facts as to whether or not there were any accommodations granted and whether or not the interactive process was engaged by Walmart in good faith. Now, Mr. Garcia attempted to return to work and was told that there were no positions. Yes, that is correct. Walmart had said, please wait, we'll wait for an open position. Once there's an open position, we'll put you into one. Now, when he sought to return to work and they responded, there were no open positions at that time. Did they say to him, we have a request from your doctor that you be excused from work until December 31st? No, Walmart never knew. Walmart's own key witnesses testify they were not aware of any expected return to work date. They were not aware of any doctor's note. So, they said they weren't aware of it. So, not only were they not aware of it, they of course then didn't tell him. So, it sounds as though the only person who was aware of the possible return date of December 31 was the doctor who sent the note. Correct. The doctor didn't send it to Mr. Garcia and so far as the record shows, nobody at Walmart ever read it. Correct. Or at least never remembered it. Correct. So, therefore, any of its actions taken after by telling him and stringing him along for four months saying, just wait for an open position, just wait for an open position. And is there evidence in the record that there were in fact open positions? Walmart's own employees testified to it. The store manager via the 30B6 corporate representative testified to it. And that's why I want to follow up on that question right there. So, I did read the transcript of the 30B6 witness and she does say that there were positions available in Lawn and Garden. Your client said in the declaration that he was told there were no positions in Lawn and Garden. I think that's paragraph 10 of one of his declarations. Yes. And that he was also told in October, just a month before he felt compelled to resign, that there was no work for a blind person. And so, on the discrepancy of whether or not there were positions available or not positions available, we have his declaration. Is there any other evidence? And I'm not saying it's insufficient, but I'm just trying to see. Is there any other evidence besides what's in his declaration that Walmart told him, hey, look, we don't have any openings right now? Walmart testified that there were about 315 sales associate openings, which he was a sales associate. So, besides Lawn and Garden, he could have worked in any of the 315. Walmart had also testified that he was able to conduct the essential functions of his job. So, he could work in any of the 315 open spots, but they never offered it to him. As a matter of fact, as you were stating, they had stated the opposite, which was to lie to him and tell him just wait for an open position, just wait for an open position. And a month before he felt compelled to resign, they said there's no work for a blind person. Right. And so, that's what I'm trying to pick out here is that other than his declaration, is there any evidence in the record so far that supports his statement that, hey, I asked and they said, nope, like there's not an email or another witness who says, oh, yes, that's what he was told. Was it just his declaration on that point? So, there was a Department of the Blind VOC person that he had enlisted through the Department of the Blind to advocate for him, a vocational advocate, I believe was what her name was, Brooke Davis. And she had also communicated with Walmart trying to get him to return to work because he, Mr. Garcia, had attempted to get back to work and had vocalized this as early as mid-July of 2019. When he realized he wasn't getting anywhere, that's when he invoked Brooke Davis' support to help him get back to work. And they had conversations together and separate with Walmart about going back to work. So, there's also testimony from her that they denied the accommodations and they did not let him go back to work. And I take it, I want to be fair about this, but I take it Ms. Davis would testify effectively that no one at Walmart said, oh, by the way, Ms. Davis, there are jobs available for him right now. Correct. I don't believe that she had testified to what you were saying, that there were jobs available. They were told there were no jobs available to wait for an open position, which is why he kept following up. Because it seems to me that the way I look at this case, that's one of your best points, is that if an employee is given different reasons for why they can't come back, that leads to an inference that maybe something fishy is going on here. I think that's kind of the sense of your argument. Yes, Your Honor. Yes. And this also, and all of this would be a jury question. So, not only are there disputed facts between the parties, but a lot of the dispute comes from Walmart's own employees. And what Walmart did at the summary judgment stage was just try to pick out, well, which evidence supports their position, even though it comes from the same employee. And it was improper for the lower court to conclude that an expected return to work date means that Walmart was justified in all of its actions and that it could just sit on the note and lie to him and not explore alternate work. An expected return to work date does not, as a matter of law, preclude Mr. Garcia from doing any and all work. But at the end of the day, this expected return to work date is near irrelevant because Walmart never knew of this during Mr. Garcia's employment. It also doesn't make sense that, because Walmart is alleging that Mr. Garcia knew of his expected return to work date and before he had resigned, there is actually no evidence of this. And if you take a clear look at the record that Walmart actually presented, they are all inferences that Walmart has attempted to try to have you draw to show that Mr. Garcia allegedly knew about the expected return date, which he never knew about. And the doctor, Dr. Mi, who had provided this expected to return date, also testified that, had she been asked, she could have and would have changed that expected to return date and just wanted to give him enough time to be out of work had he wanted to continue to seek leave. Whether Walmart discriminated against Mr. Garcia on the basis of his disability is a question for the jury as well. Only two of the four elements were disputed by Walmart, adverse action and causation. And I'll take both of these in turn under the analysis of summary judgment standard, which is, are there disputed material facts? Again, we say that there are first under adverse action. Mr. Garcia went on leave around June 1st of 2019. As of mid-July 2019, he notified Walmart that he wanted to return to work. He was continuously told by multiple people to wait for an open position. And despite his follow-up, he was never told about any restrictions. Walmart had conceded that they were not aware of any medical restrictions or any expected to return to work date. Although there need only be one type of adverse action to survive summary judgment, Mr. Garcia has presented evidence of at least three different types of adverse action, one being forced to remain on unpaid leave for approximately four months. Two is not being allowed to do any work, even though Walmart testified there were 315 positions he could have and qualified for during his employment. And three, being compelled to resign after those four months of being strung along, combined with comments that he should retire early, he should think about retirement, referring to him as a liability, saying there's no work for a blind person, and refusal to allow him to work in any capacity at all, whether it be part-time, seasonal, with or without accommodation. One thing, this is kind of a detail. One thing that I'm concerned about or puzzled about is when he got the state involved, there was a request by somebody working for the state that he be allowed to use some sort of a head-worn device, and that was refused? Correct. So it was a wearable headlight and a wearable magnifier. So what Mr. Garcia had used in the past is a handheld magnifying glass. There really isn't a dispute as to the handheld magnifying glass because he was able to use it. He apparently used that routinely while he was working. Correct, correct. But he wanted a wearable headlight for the darker spaces, and he and the Brook Davis, the vocational rehab counselor. And a wearable magnifier as well. As well as to wear a magnifier, and part of that is because he sometimes, infrequently, but still sometimes had to climb the ladder to stalk the shelves or get up there or look. So he wanted to be safe and have two free hands instead of having to climb the ladder with only one free hand because he has to use a handheld magnifier. So he had requested a wearable headlight and a wearable magnifier, which Walmart denied basically outright saying it does not comply with the uniform. And that was during the period when he was not working, that they said you can't do that? I believe that he had made that request before mid-July of 2019. And when does Walmart respond you can't do it? Sorry, I want to make sure I get this date right. I think we're talking September 24, 2019. That's the date that you're. . . Correct. Yes, Your Honor. September 24, 2019, he had requested to use a wearable headlight for darker areas, as well as a magnifying glass, as well as the wearable magnifier. And I think at that date he was not working. He was not working. But wanted to come back. Correct, and had been very vocal about coming back and wanting to come back. And this was one of the requests that was made on his behalf. Correct. And it was denied based on, wait a minute, that's not part of the uniform. Correct. Okay. Yes, and I would like to reserve the remaining time that I have. Thank you very much. You're very welcome. Good morning. May it please the Court, my name is Stephen Kendall, appearing on behalf of Respondent Walmart. And in this case, the District Court did not err and properly granted summary judgment to Walmart on all claims. While we recognize review is de novo, we believe this Court will also find, just as the lower court did, that there is no genuine dispute as to any material fact and the defendant remains entitled to judgment as a matter of law. And when it comes to this case, there are three core policy issues that arise that touch on each of plaintiff's claims. And these policy issues arise because we don't want employers to question employees' doctor's notes, we don't want them proactively reaching out to employees' doctors and having medical discussions with them. Yeah, but it sounds as though the doctor's note's really not part of the case, that they don't mention it, he doesn't mention it. I mean, do you dispute what was just told to us, that Walmart people testified they were unaware of the note? I do dispute that. The evidence in the record that Walmart actually received information about the restriction is overwhelming. No, no, that's a different question. Receiving the information and having the people in Walmart who are doing the actions knowing about the information are two different questions. Do we have evidence that the Walmart people knew about the doctor's note, the people who were engaged in the negotiations or interactions with the plaintiff? Yes, we do. And so this is for two specific employees. This would be for store manager Cynthia Guajardo, and then we also have Widalis Alvarez, who was a manager doing HR duties. Ms. Guajardo actually testified at her deposition after she had a chance to look at documents and refresh her recollection that she was aware of the restriction imposed by the note. And did Walmart people ever tell him, the reason we're not having you come back is you've got a doctor's note requesting that you can't come back until December 31? So we don't have evidence in the record showing that they actually specifically told him that date. Do we have evidence that they in fact said there are no jobs available for you? I think as Judge Owens pointed out, it looks like from plaintiff's declaration, he says that he was told that there are no jobs. And do you dispute the truth of that? I do not. However, I think that when we're looking at what he was told, for example, by store employees, when we're looking at being told you need to just wait, when there is a medical, a full medical restriction that says you cannot return to work until X date, absent an earlier date. But let me ask it this way. Sure. If when he asked to come back to work, he's not told, hey, wait a minute, your doctor said you can't come back to work until December 31. He's instead told you can't come back until positions, and he presents evidence that there were positions. That sounds to me as though he's got a cause of action here and go to the jury in terms of what's true. Well, I would disagree, and here's why. Okay. I think plaintiff's theory of the case is trying to create an affirmative obligation where an employer must, one, assume that the employee does not know the information contained in his own doctor's notes being sent on his behalf, and, two, a new affirmative obligation to have to tell them what's contained in that doctor's note. But that's not quite my question. My question is what happens when they say there's a reason you can't come back, and the reason you can't come back is that there are no positions? Now, when they say that and they don't say we've got a doctor's note, does not that raise at least a possible inference that they're discriminating against him? I don't think so, and here's why. Because when you have this full medical restriction, that's not an untruthful statement. To say there are no positions, you need to wait, that aligns with the fact that you cannot return to work at that time until such a date comes that's on the doctor's note. If there are no positions available or not, is it irrelevant if he can't return to work? Correct, correct. But they didn't tell him that. They didn't say there are no positions available. Sounds like a pretext to me. I think that goes to the policy argument we're making that employers need to be able to operate under the basis that employees are aware of what their doctors are sending on their behalf. I think that's extremely important for employers to be able to do here because otherwise we're opening ourselves up to a situation where employers now have to question information in the doctor's notes, perhaps proactively reach out to doctors. But that's prohibited by the FMLA, for example. We don't want employers proactively reaching out to doctors, questioning the information in the notes. Both sides need to operate under the presumption that everyone knows what the doctor is telling everyone. Let me give you a hypothetical. Let's put the doctor's note aside. Sure. So let's say I'm a high school junior, and I go to tryout for the basketball team, and there's a tryout. And the coach says, well, John, you know what? We're all full this year. Sorry, you're a great player, but we're all full. There are no spots for you on the team. So I get cut. Then I find out a week later there are actually five roster spots on the team that went unfilled. Now, isn't there at least a pretext that the coach was not being honest with me, that the coach just didn't want me on the team? But the reason he said that was because that was the easy way to say it? I think that analogy is a little different here. How so? And I'll explain. Because the situation we're dealing with in this case, right, when the employees are telling him, as Mr. Garcia is saying, just wait, we don't have spots, right, that's factually true because there are not spots if you are completely medically restricted. Okay, but that's a difference. Well, hold on. But that's not what he was told. He was told there are no spots, correct? His declaration was that they told me there were no jobs available. It was not there are no jobs available for someone who has your eye condition. Correct? Sure. So let's get back to the hypothetical I raised. How is that different from the facts that he alleges in this case? Because in this case, I think the analogy is still different because in order for the analogy to work, the coach would need to be aware of, for example, something preventing the student from being on the basketball team. According to the plaintiff's version of the fact, Walmart didn't know that. Correct. And that's just simply not supported by the record. The record, again, has overwhelming evidence that Walmart was aware of the restriction. And I can point it out to you. So let's assume they did know that. The fact that they didn't tell him that was the reason. Isn't that an issue that the coach, in my analogy, the coach wasn't being straight with him, and by his analogy, that Walmart wasn't being straight with him? I think not because I think it goes back to this idea that we're creating an affirmative obligation to tell employees what is on their own doctor's notice. But, I mean, isn't there a jury trial issue if, from his version, I'm not saying these are the facts, but his version of the facts is that Walmart lied to him about the reason why he couldn't come back. I don't believe there's a jury issue here. And this is why. When we're looking at the note and the restrictions it provided, we have ample evidence that Walmart was aware of the restriction. For example, if we look at SCR 2829, Ms. Guajardo, aware of the restriction provided by the note. We also have- She says she's aware. Correct, yes. She might be lying. Well, if we look at other pieces of evidence in the record, for example, SCR 9, Walmart receives automated messages from Sedgwick when Sedgwick receives new information. So we even have in the record one of these e-mails being sent that contains the information in the note, along with the December 31st date. Along with that, Ms. Alvarez, she was one of the HR supervisors at the store level. She testified to being aware of the restrictions as well. And, actually, in the record that we see at SCR 36 to 38, Ms. Alvarez actually contacted Sedgwick, was asking about a status update, and was told the plaintiff remained on this leave. So what is it exactly that was said in the doctor's letter? And the reason I'm asking that question is if he says, I want to come back to work, isn't that possibly to be construed as, okay, my doctor asked that as a possibility, but, listen, I'm ready to come back. So, in a sense, contradicting the doctor. Listen, the doctor asked for that, but I don't need it. So that's not what happened in this case. There's a difference here. So the doctor's note itself, and I know my friend opposing counsel really likes to speak to, if you look at the note at the top of it where it says expected return to work date, right? If you look below that in Section B, it says completely unambiguously, I certify that the associate named above is medically able to resume work on December 31st, 2019. That's an affirmative statement. But he will be able then, it does not say he's unable to work before then. Resume, medically able to resume, I think is the key part there, right? Oh, you didn't take my point. He says he's medically able to resume on 31st. It does not say he's unable to resume before that. I would disagree with that reading of the note. I think that, and also other parts of the note speak to the fact that you're not able to work prior to that date. For example, underneath the medical certification for the return to work date, we also have when they can return, there are certain restrictions that apply. So the note not only goes to when you can return, but upon this date hitting, that trigger date, what are the restrictions we're looking at, what kind of reasonable accommodations do we need to look at upon the return? And what kind of restrictions are we talking about? For example, he might like to have a head-worn magnifying device. So in this case, on Dr. Mee's note, they're listed out as things such as bending, seeing, breathing, pulling, those sorts of things, and the doctor will provide, related to that specific activity, how much they can perform the activity. And then Cedric will view the note, determine what sort of reasonable accommodations can come from that. So when we're looking at plaintiff's causes of action, a large part of what the district court found is a lack of adverse action, right, in this case. Plaintiff describes his leave as forced. However, plaintiff voluntarily took the leave that he requested. First, he requested leave beginning on June 1st. That leave was approved, and it was originally supposed to last until June 30th. However, on July 4th, Mr. Garcia requested an extension of leave. So at this time, he requests longer leave, and he goes through Cedric, again, the third-party administrator, and requests for his leave to be extended. Now, Cedric sends him a letter dated July 26th. I can't hear you. I'm so sorry. Let me raise the podium a little bit. I think the microphone's a little bit low for me. So on July 4th is when he requests the extension. Is that better? Yes. On July 5th, he sends a letter saying, here's a medical packet. Please take this to your doctor. Have her complete it so that we can put you on the leave. On July 4th, Dr. Mee, the doctorate issue plaintiff's treating doctor at the time, fills out one of the pages, which is this return to work form that we see at SER 68. She completes it along with the December 31st return to work date and sends it over to Cedric. Now, Cedric contacts plaintiff via letter on July 26th. That is two days after Dr. Mee filled out the form, saying, we only received the return to work form. We really need the rest of the packet. Now, plaintiff does not respond to this letter, nor does he respond to additional letters sent by Cedric after the fact. However, Dr. Mee's complete medical restriction, again, certifying that he can resume work on December 31st, meant that Mr. Garcia could not return to work until such that date. Now, because of that, these leaves were not forced. They were by his own request. And then Mr. Garcia stated he wanted to return to work sooner than that. However, he never contacted Dr. Mee for an earlier return to work date. One of the points that Mr. Garcia makes is that Dr. Mee would have provided him with an earlier return to work date had he asked. However, I think that cuts against Mr. Garcia's argument. That means that had he simply properly communicated with his doctor, she would have been able to provide updated information to Wal-Mart and Cedric to allow him to return as he wanted. The problem I have with that argument is that he was never told by Wal-Mart, well, wait a minute, your doctor requested leave until the 31st of December, and that's why we're not abiding by your request. They said something quite different. They said, listen, there are no spots. And they didn't say there are no spots because your doctor said you can't work. They just said there are no spots. I would say in response to that, the onus is on Mr. Garcia to know what his doctor, as his doctor, is sending on his behalf to the employer. But why is not the onus on you or your client to tell him the actual reason instead of what seems to me a very stretched reason, which is to say you say, well, what they meant was there are no spots because your doctor says you can't do it. But that's not what they said. They just said there are no spots. Sure, and I think this, again, goes to the policy issue where both sides, when we're talking about either FMLA or ADA, both sides, employer and employee, need to be able to operate under the reasonable presumption that everyone knows what's on these doctor's notes. That's really important because otherwise we're going to have employers that don't know what restrictions are being provided. At the same time, we'll have a case like this, where an employee does not know what his doctor is saying on his behalf to his employer. I wanted to talk briefly about the failure to accommodate claim. Now, here, as Mr. Garcia admits, he was always allowed use of the magnifying glass. He was able to perform his job duties with the assistance of the magnifying glass all the way up until this critical date, which is June 1st, when he took his leave. Now, after Mr. Garcia goes on leave, unfortunately, he was responsible for the breakdown of the interactive process. Now, an employee can bear the responsibility for the breakdown of the interactive process if they fail to provide appropriate supporting medical paperwork. This is from Alan V. Packbell. That's 348 F3rd 1113. Now, in this case, we have at least three letters that Sedgwick sent Mr. Garcia on Walmart's behalf asking for updated information. Unfortunately, Mr. Garcia did not reply to any of these requests for additional information. This was a key component of the court finding that the failure to accommodate claim did not succeed. I'm noticing that I'm out of time. How do you deal with the refusal to allow him to have the head-worn headlight and magnifier? So at that time, Mr. Garcia could not use any accommodations because he was out on that medical restriction. But that was not the reason given. The reason given was it doesn't comply with the uniform. Right, and I believe the employee that is spoken about in this interaction is named Cindy Gonzalez. Yes. She was, as you'll see in the record from her testimony, she was not plaintiff's supervisor. She was unaware of his job duties and also was not responsible for administering his leave or accommodations. And so why was she, in fact, talking to the agent of the state? It seems that they must have approached her when they went to the store. And she didn't say, hey, I've got no authority to say this, but I'm going to tell you anyway, that that's inconsistent with the uniform and you therefore can't do it? I would have to infer what, you know, additionally was said outside of that. But we do know that she was not plaintiff's supervisor, nor was she administering the leave or his accommodations at that time. Uh-huh, uh-huh. But was this raised in the district court? The incident regarding Ms. Gonzalez? Yes. I believe the parties, I'm not sure. I'm looking at stuff in the district court that it was raised. Okay. So one of the things I'm asking is, was it appropriately raised? I didn't see you saying in your brief it was not appropriately raised. I don't believe we did. Yeah. Okay. All right, thank you, counsel. Yes, thank you. Your Honors, I'll be really brief here. I just want to address a couple of things. The record is very clear as to Walmart's key witnesses' testimony, and I will point to page five of our reply brief with the transcript that's excerpted from both the 30 v. 6 corporate representative not having any knowledge, ever seeing or knowing of Dr. Mee's expected return to work date via her note, as well as People Lead Alvarez's testimony that she was not aware prior to Mr. Garcia resigning of any medical restriction. An expected return to work date is one that is expected of when an employee can return. It is not, as a matter of law, under summary judgment standards, the only date an employee can return to work. And it does not preclude the employee from returning earlier or returning later. We see these instances all the time where employees request leave for a certain date and then either come back earlier or request for additional extension. But all that is irrelevant because Walmart's own testimony is that they were not aware of any medical restrictions or an expected to return to work date. And I would also point this. I just heard something quite the opposite from your friend on the other side. What's going on here? On whether or not Walmart knew of the. . . He says, wait a minute, he gives me chapter and verse that some so-and-so says, yes, she was well aware of that. Yeah. So the deposition testimony on page 5 of our reply brief states this. The question is, were you aware before November 14, 2019, as to whether or not Mr. Garcia had any medical restrictions on being able to come back to work at Walmart? Answer, no. The 30B6 testimony is this. Question, medical paperwork, I believe you testified that goes through Cedric directly. Correct? Answer, yes. Question, so does Walmart itself by facility or store level receive the medical paperwork that a provider or doctor signs? Answer, no. Question, and Cedric does not provide a copy of the doctor's letter to Walmart on a facility or store level. Correct? Answer, correct. Question, which is why you never saw Dr. Mee's letter or note. Correct? Answer, that would be right. I can see that I'm out of time, so unless there are. . . You know them, just make sure. You good? I'm good. All right. Thank you so much, Your Honors. Thank you both for your briefing argument. This matter is submitted.
judges: FLETCHER, BEA, OWENS